UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

MICHAEL JENNINGS                                                                              PETITIONER

v.                                                                        CIVIL ACTION NO. 3:06-CV-P309-S

JAMES L. MORGAN                                                                              RESPONDENT

### MEMORANDUM OPINION

This habeas corpus action is before the Court on review of the Magistrate Judge's findings of fact and recommendation, issued following an evidentiary hearing. For the reasons that follow, the Court will conditionally grant the writ.

**I.**

On May 26, 1994, when he was 14 years old, petitioner Michael Jennings shot and killed Toriano Oldham and Frederick Crook at a housing project in Louisville. Jennings had a history of severe depression and mental health issues. He had been assigned to foster care, though at the time he was living with his uncle and cousin, DeQuan and Antonio Blinco. Nine days before the shooting, Jennings had witnessed Antonio's death from a shotgun blast, for which he believed Oldham to have been responsible. Just prior to the shootings, Jennings was confronted and taunted by Oldham and Crook. He left the scene, entered his house, and returned with a handgun. The taunting continued, and DeQuan Blinco encouraged Jennings to act by telling him, "Man, do what you got to do." Jennings hesitated briefly, then opened fire. His first shot evidently missed, but he then emptied his handgun into Oldham and Crook. He thereafter fled to California before being arrested in January 1995 and returned to Kentucky to stand trial for murder.

Jennings' family retained for him an attorney, Frederick Radolovich, who had substantial experience in criminal law, including both death penalty and juvenile offender cases. Relying on his

lawyer's advice, Jennings pled guilty to the murder charges and was sentenced (pursuant to the agreement) to life imprisonment, with parole possible after 12 years. It is undisputed that the death penalty was never on the table due to the offender's youth, and that the statutory maximum penalty for his crimes was life without parole for 25 years.

What is disputed is whether Radolovich sufficiently advised his client as to the nature of the penalties he faced. Jennings claims that Radolovich led him to believe that the death penalty was available, and that he would have insisted on taking the case to trial had he known that it would not be for his life. In this habeas corpus petition Jennings seeks to void his conviction and withdraw his plea on the ground that his counsel's performance was so deficient as to violate the Sixth Amendment, applied to the states through the Fourteenth.

## II.

Jennings' request for relief is governed by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. Law No. 104-132, 110 Stat. 1214. Specifically, 28 U.S.C. § 2254 and the jurisprudence it has spawned will control the outcome of his petition. We must therefore consider the substantial procedural hurdles that AEDPA throws up in the path of state habeas petitioners like Jennings.

To begin, we note that the petitioner has exhausted his state-court post-conviction remedies. In addition, the Court has already decided, in light of *Burton v. Stewart*, 549 U.S. 147, 127 S.Ct. 793 (2007), that the AEDPA limitations period reset when his sentence was reaffirmed in 2005, rendering the present petition (his first in federal court) timely. *Jennings v. Morgan*, 2007 WL 4292038 (W.D.Ky., Dec. 6, 2007).

The magistrate judge properly granted an evidentiary hearing notwithstanding 28 U.S.C. § 2254(e)(2), because Jennings did not "fail to develop" the factual predicate to his claim in state court. As the Supreme Court has interpreted § 2254(e)(2), "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Michael Williams v. Taylor*, 529 U.S. 420, 432, 120 S. Ct. 1479, 1488 (2000). As will be discussed fully below, petitioner's ineffective-assistance-of-counsel claim involves a two-part test: counsel must have been deficient, and the defendant must have been prejudiced by his errors. In state collateral proceedings, the Kentucky Court of Appeals did not decide the factual question whether Jennings's counsel had misinformed him with regard to the possible penalties for his crime. It relied instead solely on its assessment that "it is impossible for appellant to show prejudice . . . because he still received the benefit of a very good bargain." *Jennings v. Commonwealth*, No. 1998-CR-01213, slip op. at 3 (Ky. Ct. App. Feb. 18, 2000). None of his subsequent state appeals or petitions addressed the merits of the Sixth Amendment question, nor was he granted any kind of evidentiary hearing before he came before this Court. Because there was no state-court fact-finding, the magistrate's grant of an evidentiary hearing was appropriate. For the same reason, there is no determination of facts to which this Court must defer under 28 U.S.C. § 2254(e)(1).

Having successfully navigated the procedural maze, Jennings must contend with the standard of review established in 28 U.S.C. § 2254(d). That section bars habeas relief on any claim "adjudicated on the merits in State court" unless the state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

A state court "has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of § 2254(d) when it has decided the petitioner's right to post conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits." *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004), *cert. denied*, 546 U.S. 963 (2005). Where a claim has not been adjudicated on the merits in state court, the pre-AEDPA standard of review (favoring habeas claimants) applies. *See Brown v. Smith*, 551 F.3d 424, 430 (2008). Petitioner therefore asks the Court to find that the state court did not adjudicate his claim on the merits. We are unable to do so.

The state court decided petitioner's claim on the merits when it held that "it is impossible for appellant to show prejudice" from any error committed by his attorney, and that therefore his claim must fail. *Jennings v. Commonwealth*, No. 1998-CR-01213, slip op. at 3 (Ky. Ct. App. Feb. 18, 2000). The court stated that petitioner's arguments had been "conclusively refuted by the record" before it. *Id.* That record contained Jennings's assertion that he would not have pleaded guilty but for his counsel's bad advice, and the court flatly refused to credit that assertion in the face of what it deemed "a very good bargain." *Id.* Though (as we explain below) this conclusion was in the Court's view objectively unreasonable, the evidence adduced at the hearing was not so substantial, in terms of either its content or its volume, as to prevent the state court from deciding the case on the merits. This Court must therefore apply AEDPA's deferential standard of review, at least as to the "prejudice" prong.

With respect to the deficient performance question, however, there is no state-court determination of facts or conclusion of law to which this Court might defer. The sole reference in the Kentucky Court of Appeals's opinion concerning this issue is a parenthetical indication that "attachments submitted by appellant himself suggest that he was not" misinformed as to his eligibility for the death penalty. *Id.* This mere suggestion is not sufficient to warrant deference as to either fact or law. The Court therefore has no choice but to judge the merits of that issue for itself..

### III.

We turn now to the substantive law governing petitioner's ineffective-assistance-of-counsel claim. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984) provides the basic two-part test. The first prong, deficiency, "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Second, the petitioner must show that he was prejudiced by his counsel's errors; those errors must have been so serious as to have "so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

**A.     Performance of Counsel**

As explained above, the Court must consider the first prong of the test *de novo*, for lack of any state-court decision to which we can defer.

In judging the performance of counsel, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "To be deficient, counsel's performance must fall below an objective standard of reasonableness." *Lyons v. Jackson*, 299 F.3d 588, 596 (6th Cir. 2002) (*citing Strickland*, 466 U.S.

at 687-88)). With regard to the first step of the analysis, the Sixth Circuit has stated that "[a] failure to provide professional guidance to a defendant regarding his sentence exposure prior to a plea may constitute deficient assistance." *Moss v. United States*, 323 F.3d 445, 474 (6th Cir. 2003) (*citing Magana v. Hofbauer*, 263 F.3d 542, 550 (6th Cir. 2001)).

To see how this standard has been applied, consider *Miller v. Straub*, 299 F.3d 570 (6th Cir. 2002),[1] in which the Sixth Circuit addressed a situation similar to the one presented here. In *Miller*, two teenaged defendants were charged with first-degree murder. Trial counsel advised each of them to plead guilty, believing that they would be sentenced as juveniles and that they would thereby be subject only to imprisonment until age 21. While this was in fact the initial disposition of both cases, the trial attorneys failed to advise their clients that the prosecution was both permitted and likely to appeal their sentences and seek to have them treated as adults. The prosecution appealed both cases and succeeded in having them treated as adults and sentenced to life without possibility of parole, the only sentence available in Michigan for adults convicted of first-degree murder. *See id.* at 573-74. The defendants eventually sought federal habeas corpus on the ground of ineffective assistance of counsel. *Id.* at 577.

The Court of Appeals affirmed the District Court's grant of the writ, concluding that the petitioners' trial counsel had been incompetent in failing to advise their clients of the likelihood of appeal and the possible effect of such an appeal on their sentences. Counsel "should have considered these possibilities, informed Miller about them, and incorporated them into his risk assessment when he advised Miller about pleading guilty." *Id.* at 580. The failure to apprise the defendants of the entirety of the effects of pleading guilty was a denial of the right to counsel because "[t]he duty of

---

[1] *Miller* was filed contemporaneously with a companion case, *Lyons v. Jackson*, 299 F.3d 588 (6th Cir. 2002). The Supreme Court denied certiorari in both cases at 537 U.S. 1179 (2003).

defense counsel to consult is paramount when a client has to decide whether or not to waive a constitutional right, such as the right to trial." *Id.* The court went on: "Because the decision whether or not to plead guilty ultimately rests with the client, counsel must ensure that the client's decision is as informed as possible." *Id.* (*citing Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93 n.1, 97 S.Ct. 2497 (1977) (Burger, C.J., concurring)). This duty was enhanced by the defendants' young age and their "practically total[]" reliance on their attorneys. *Id.* at 581. The court therefore went so far as to conclude, under the deferential AEDPA standard of review (which we do not apply here) that it was "an objectively unreasonable application of *Hill* and *Strickland* for the Michigan Court of Appeals to hold" that trial counsel had acted competently. *Id.*

For reasons similar to those expressed in *Miller*, the Court concludes that Radolovich acted incompetently in not ensuring that his client knew precisely what would be the effects of pleading guilty or not-guilty. To begin, the consistent testimony of the petitioner, his grandmother, and her friend Rachel Nelson was that Radolovich had told them that Jennings faced the death penalty if convicted at trial. The magistrate judge found this testimony credible, and the Court sees no reason to think that it is not. The testimony is bolstered by Iva Jennings's consistent affidavit, filed in state court in 1996. (App. to Br. for Pet'r 29.) It is further supported by the correspondence between Radolovich and Michael Jennings's prison legal aide, Thomas Mitchell. After learning that Jennings had believed himself death-eligible, Mitchell wrote to Radolovich seeking explanation. Radolovich responded: "As far as the death penalty, the aggravators [sic] involved is a double homicide. Multiple homicides could make one eligible for the death penalty. That is something that was an impetus to me to talk to Michael about possible settlement of the case." (App. to Br. for Pet'r 30,

Letter from Fred R. Radolovich to Thomas Mitchell (March 18, 1998)). In a follow-up letter, Radolovich appeared to acknowledge that the death penalty had not been available, but persisted in misstating the law:

> [W]hat was told to Mr. Jennings (as he well knows) is that I read him KRS 640.040[2] and gave him a copy of it. I advised him of the *Stanford* decision.[3] However, when you commit multiple homicides they can run the sentence wild, as in consecutive. Both options were explained in detail. There was talk by Mr. Chauvin, of the Commonwealth Attorney's office, of trying to seek a new interpretation of 640.040(1) due to the two years of flight in Mr. Jennings [sic] case. He was apprised of both that potential, the potentiality of the sentences running wild and other potentialities.

(App. to Br. for Pet'r 31, Letter from Fred R. Radolovich to Thomas Mitchell (March 24, 1998)). *Stanford* was not applicable to Jennings's case, as he was younger than sixteen when he committed the crime in question.[4] Furthermore, KRS 640.040(1), as it then stood, was not susceptible of a "new interpretation" allowing imposition of the death penalty: Its language is perfectly plain,[5] and *Thompson v. Oklahoma*, 487 U.S. 815, 108 S. Ct. 2687 (1988) would in any event have barred any such interpretation. Finally, Radolovich was simply wrong if he advised Jennings that life sentences or time-until-parole periods could be imposed consecutively rather than concurrently. *See* KRS

---

[2] [The Kentucky statute prohibiting imposition of the death penalty for offenders under the age of sixteen at the time of the crime.]

[3] [*Stanford v. Kentucky*, 492 U.S. 361, 109 S. Ct. 2969 (1989) (holding that the death penalty is permissible for offenders aged at least sixteen years at the time of the commission of the crime).]

[4] Perhaps Radolovich meant to cite *Thompson v. Oklahoma*, 487 U.S. 815, 108 S. Ct. 2687 (1988) (holding that an offender under age sixteen at the time of the offense cannot be executed), but the Court is unwilling to revise a decade-old letter to cast its author in a better, more competent light.

[5] *See* 1994 Ky. Acts 1197, Ch. 396, § 14 ("No youthful offender who has been convicted of a capital offense who was under the age of sixteen (16) years at the time of the commission of the offense shall be sentenced to capital punishment.")

532.110(1)(c); *See v. Commonwealth*, 746 S.W.2d 401, 403 (Ky. 1988). The lack of knowledge evident in Radolovich's letters supports Jennings's contention that he and his family were misadvised prior to entering his guilty plea.

Radolovich's testimony on this point at the evidentiary hearing does not persuade the Court that he acted competently. To begin with, he repeatedly indicated that his memory of specifics relating to Jennings's case was hazy at best. Consequently the Court is hesitant in light of the above-quoted correspondence (more nearly contemporaneous with the events in question than his testimony) to credit his claim that he understood at the time that the death penalty was off the table because of Jennings's juvenile status. And even if he had known the law, Radolovich admits that "[a]pparently I never made it clear that death was not part of the [picture]. . . . I think I gave them the statutes and did not make them as clear s I should have . . . ." (Tr. Ev. Hr'g 25.) Jennings and his family had been provided with copies of the indictment and the plea sheets, all of which would to a layman appear to indicate that death was a possible punishment.[6] The fact that the indictment indicated a possibility of death, combined with the fact that the attorneys evidently saw it necessary to write an express exclusion of death into the plea agreement, could easily be construed by someone with little knowledge of the law to mean that the threat of capital punishment was real. This impression would only have been affirmed by the plea colloquy, at which both Radolovich and the prosecutor indicated to the judge that the death penalty was excluded "by terms of the agreement."

---

[6] The indictment indicates that the crime is a capital offense, with possible punishments of 20 years to life, or death, or life without parole for 25 years. (App. to Br. for Pet'r 1.) The Commonwealth's Offer on a Plea of Guilty specifically state: "The terms of this agreement exclude death and life w/out possibility of parole for 25 years as potential penalties." (App. to Br. for Pet'r 2.)

*Jennings v. Morgan*, No. 3:06-CV-P309, slip op. at 15 (W.D. Ky. June 17, 2009) (Whalin, Mag. J.) (quoting Tr. Video R.).

Radolovich, Chauvin and respondent provide numerous explanations for why these documents were drawn up as they were, and why the plea proceedings went as they did: The indictment sheet is computer-generated and was automatically printed with death in the list of available sentences; an abundance of caution warranted being explicit in stating that the death penalty was not an option; and so on. But without unequivocal advice that death was never available, it is easy to see how a frightened teenager could be confused by the lawyers' treatment of the subject. Radolovich acknowledged as much in his testimony:

> Q. So [to] the best of your recollection, *the information that you gave to them could well have advised them that he could get the death penalty?*
> A. *Yes ma'am.* It would have reflected what was in the indictment, and the indictment spells it out in that side paragraph [containing the available punishments].
> Q. And do you recall specifically what you had said to Michael about what penalties he was facing, what you gave him?
> A. I would have given him the same documents. I should have discussed the traversing statute, and my normal course of action would be to explain that death and life [without parole] do not apply. Do I remember going over that with him? No, ma'am I do not.

(Tr. Ev. Hr'g 35 (emphasis added).) Later in his testimony, Radolovich elaborated on this idea:

> Sometimes—my experience has been that the printed word sometimes carries more impact on somebody than the spoken word, if you will. On an official document or two official documents, it says, "Death penalty or life without parole for 25 years." sometimes the impact of that, especially at age 13 or 14, could blot out any other explanation because it's there; it's in black and white.

(*Id.* at 54.) Even if Radolovich did not affirmatively advise his client that he had better plead guilty to avoid the injection chamber, his acknowledged failure to make precisely clear the implications of Jennings's decision to plead guilty and the punishments available if he chose not to do so fell

-10-

below the standard of attorney competence. Jennings certainly was not "as informed as possible" before making his decision regarding a plea. *Miller*, 299 F.3d at 580. The Court therefore finds that Jennings received inadequate counsel at trial.

**B.     Prejudice**

Having found Radolovich's performance to have been substandard, the Court must now address the question whether Jennings was prejudiced. In the context of a guilty plea, proving prejudice requires the petitioner to "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1984). As discussed above, the deferential AEDPA standard of review applies here because the state court squarely addressed this issue and reached a decision on the merits.

The state decision cited the relevant Supreme Court authorities. It was therefore not "contrary to" federal law within the meaning of 28 U.S.C. § 2254(d)(1). *See Terry Williams v. Taylor*, 529 U.S. 362, 406, 120 S. Ct. 1495, 1520 (2000). Nor was it, we think, "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The only fact apparently deemed relevant by the state court was its conclusion that Jennings received a favorable plea bargain. This was in its view sufficient to show that there was no prejudice as defined by *Hill*. As far as it goes, this fact was not unreasonably determined. By entering the agreement, Jennings avoided a potential sentence of life without parole for 25 years. The life sentence he received instead allowed him the opportunity to earn parole after 12 years. Cutting more than half off of the available no-parole period was a substantial benefit, and the state court was reasonable in so concluding.

Petitioner's only remaining avenue for relief is thus to claim that the state court rendered a decision that "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As relevant to this case, this clause means that relief is available if the "state-court decision . . . correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Terry Williams*, 529 U.S. at 407-08. The question is "whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In determining what "clearly established federal law" to apply, federal habeas courts are restricted to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. In discerning the meaning of the prejudice prong of *Strickland*, therefore, the Court is for purposes of this case restricted to holdings of Supreme Court decisions rendered prior to February 18, 2000. This restriction prevents us from considering any cases except for *Hill* and *Strickland* themselves, as the Supreme Court had not further elaborated on the meaning of "prejudice" in this context.

Combining the standard of review with the substantive issue in this case, we are left with the following question: Was the state court objectively unreasonable in holding that there was no reasonable probability that Jennings would have pled not guilty had he known he was not eligible for the death penalty? Or, conversely: Is it reasonable to think, in light of all the evidence, that the benefit to Jennings from his plea agreement was so great that there is no reasonable probability that

he would have pled differently had his attorney clearly informed him that the death penalty was not available?

There is a vast disparity between a death sentence and the true maximum Jennings faced of life without parole for 25 years. It is plausible that the only thing that kept Jennings from taking a risk at trial was that he thought that he would be risking his life and not merely his liberty. He has been pursuing this line of argument for over a decade, and maintains its truth despite the fact that, should he succeed, the prosecution is likely to re-try him and seek a harsher penalty than the one imposed in accordance with the plea agreement. (Indeed, the prosecution devotes a substantial portion of its most recent brief to an admonition that it is prepared to go to trial and seek life without parole for 25 years.)

But by the same token, the state court was not obviously wrong to rely on the significant disparity between the punishment he received in the bargain (life with parole available after twelve years) and what the prosecution views him as likely to have received at trial (no parole for at least 25 years). It was arguably reasonable for the Kentucky Court of Appeals to have thought that, having admitted guilt in a double homicide involving a semi-automatic weapon, Jennings would ultimately have accepted the same plea bargain. This notion is bolstered somewhat by the fact that every court to have reviewed this case until it arrived here has ruled against Jennings—did all of them act unreasonably in rejecting his claims?

None of those courts, of course, had access to the evidence gathered at the magistrate judge's hearing. Ever since he learned of Radolovich's mistakes, shortly after he entered prison, Jennings has sought to withdraw his plea and go to trial, arguing that this is what he would have done in the first place had he been properly advised. The magistrate judge found his unequivocal testimony on

this point—that he would have elected to go to trial had he known that he did not face death—to be entirely credible. *Jennings v. Morgan*, No. 3:06CV-P309, slip op. at 36 (W.D. Ky. June 17, 2009). This assertion is also supported by the testimony of Iva Jennings and Rachel Nelson.

Jennings's testimony is bu`ttressed by the fact that he had available the defense of "extreme emotional disturbance" (EED). If proved, EED would reduce his offense from murder to voluntary manslaughter, which carries a maximum sentence of twenty years (with parole available in ten). Kentucky law now holds that the onset of EED "may be more gradual than the 'flash point' normally associated with sudden heat of passion," so long as the condition is "a temporary disturbance of the emotions as opposed to mental derangement per se." *McClellan v. Commonwealth*, 715 S.W.2d 464, 468 (Ky. 1986). EED may be provoked by any event, even words, which are reasonably sufficient to arouse an extreme disturbance. *Gall v. Commonwealth*, 607 S.W.2d 97, 108 (Ky. 1980). As the statute defines the defense, whether the disturbance is reasonably aroused is to be judged on a subjective basis, "from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." KRS 507.020(1)(a).

Had he gone to trial, Jennings could have pointed to several factors as providing an EED excuse. He was a 14-year-old boy with a history of depression and consequent hospitalization. His cousin had just recently been murdered before his eyes. Oldham, the person Jennings believed responsible for the killing, had confronted and taunted him. His uncle had egged him on, encouraging him to shoot. Jennings thus had at least a superficially plausible defense, a fact that lends some weight to his assertion that he would have pleaded differently had he been properly advised.

But then again, there is substantial evidence and argument militating against Jennings here: There was a lag of more than a week between Jennings's cousin's death and the killings. Jennings had to leave the scene of the crime in order to retrieve the gun, and therefore had time to think through what was happening and what he was about to do. He did not simply fire one shot at his tormenter; he emptied the handgun into two men. Chauvin may well be correct in asserting that EED would have been "a terrible defense." (Tr. Ev. Hr'g 141.) Assessing the situation soberly, it might be hard to believe that competent counsel would have wanted his client to proceed to trial relying almost solely on the EED defense. However, we must remember that ultimately, the decision is the defendant's to make, and that he has every right to assert his constitutional guarantees in an imprudent fashion.

Were this court reviewing the state court's judgment *de novo*, we would have little trouble finding a reasonable probability that Jennings would have pleaded differently had his counsel performed properly. *See Miller*, 299 F.3d at 581-82 (suggesting that, in the Sixth Circuit, a habeas petitioner's self-serving testimony may be sufficient on its own to show prejudice in the change-of-plea context); *Magana v. Hofbauer*, 263 F.3d 542, 547 n.1 (6th Cir. 2001) (noting that the Sixth Circuit has not explicitly adopted a requirement that a defendant must come forward with objective evidence to support his testimony that he would have changed his mind about pleading guilty). In the context of a § 2254 petition in which the state court has adjudicated the claim, however, we cannot rely on circuit precedent. This is therefore a far closer case.

Ultimately, however, we find in petitioner's favor: In light of all the evidence, the state court's decision was objectively unreasonable. The deciding factor, in this Court's view, is the magnitude of counsel's error in allowing his charge to think that he faced the death penalty.

Regardless of the bargain that counsel obtained, the risk-reward calculus that Jennings believed he faced was so vastly different from the true state of affairs that the Court must fully credit his assertion that he would have taken the case to trial had he been properly informed. *Cf. Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709 (1968). That is, there is a reasonable probability that Jennings would have pleaded differently but for Radolovich's errors, and the state courts acted unreasonably under Hill when they found that no such probability existed. The Court therefore finds that Jennings's claim fulfills the prejudice prong of *Strickland* and *Hill*.

\* \* \*

As the Court has explained, the performance of petitioner's trial counsel was legally inadequate. In addition, the state court's ruling that this error resulted in no prejudice to the defendant "involved an unreasonable application of[] clearly established federal law," 28 U.S.C. § 2254(d)(1). The Court therefore accepts the magistrate's recommendation and will conditionally grant the writ of habeas corpus.

## IV.

Petitioner has raised a second issue, unaddressed in either the latest round of briefs or the magistrate judge's recommendation. He claims that under Kentucky law, he was entitled to a transfer hearing before being moved from juvenile court to circuit court, and that he neither received nor properly waived such a hearing.

Jennings first made this argument in his state habeas petition, which followed his Ky. R. Cr. P. 11.42 collateral attack on the effectiveness of his counsel. The Lyon Circuit Court dismissed his state habeas petition on April 11, 2003, holding that "the Petitioner waived any defects in such transfer by his voluntary and knowing guilty plea." *Jennings v. Haeberlin*, No. 03-CI-00034, slip

op. at 1 (Lyon Cir. Ct. Apr. 11, 2003) (*citing Sanders v. Commonwealth*, 663 S.W.2d 216 (Ky. Ct. App. 1984) ("Generally, a plea of guilty constitutes a waiver of all defenses other than that the indictment charged no offense.")). The court went on to indicate that its decision was procedural rather than on the merits:

> The fact that the Petitioner alleges that his guilty plea was not voluntary because he was led to believe that he could receive the death penalty and the death penalty was not an option for him as a juvenile is not a grounds to declare his conviction void. It would be the grounds for collateral attack under Criminal Rule 11.42. The Petitioner apparently filed an 11.42 in April of 1997 which was subsequently denied.

*Id.* at 1-2. The court reasoned, in other words, that setting aside a conviction on the ground of invalid waiver is the sort of relief that must be sought in the first instance in the Rule 11.42 petition. That rule, the primary means of collateral attack in Kentucky, provides (in relevant part): "The motion shall state all grounds for holding the sentence invalid of which the movant has knowledge. Final disposition of the motion shall conclude all issues that could reasonably have been presented in the same proceeding." Failure to raise a claim in the initial 11.42 motion will foreclose raising it in a subsequent motion if it could reasonably have been presented in the initial petition. The Kentucky habeas court thus held that Jennings had procedurally defaulted the transfer issue by not raising it in his initial motion.[7]

> This procedural default dooms petitioner's claim in this Court. The Supreme Court has held:
>
> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

---

[7] This fact prevented the state habeas court from hearing his claim as well. *See Gray v. Wingo*, 423 S.W.2d 517, 519 (Ky. 1968) (where issues could have been presented in an action under Ky. R. Cr. P. 11.42, they are concluded in that action and a writ of habeas corpus will not lie).

-17-

*Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991). Jennings's transfer claim cannot survive this test.

First, "'cause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him." *Id.* at 753. Jennings has presented no argument that anything at all, let alone anything external to himself, prevented him from raising the transfer-hearing argument in his initial state-court collateral attack. He cannot prevail under the cause-and-prejudice standard.

Second, there is nothing in the record to show that entering a plea or standing trial before the circuit court, rather than the juvenile court, would constitute a "fundamental miscarriage of justice." This is an equitable exception to the rules of comity that normally protect valid state-court judgments from federal interference, and the Supreme Court has explicitly tied it to the actual innocence of the defendant. *See Schlup v. Delo*, 513 U.S. 298, 321, 115 S. Ct. 851, 864 (1995). Jennings has admitted his guilt. The choice of court in which he is re-tried would not to this Court's eye create a miscarriage of justice. Consequently his petition for the writ must be denied as to this claim.

## V.

For the reasons set forth above, the Court finds that Jennings is entitled to a conditional writ of habeas corpus enabling him to withdraw his guilty plea and proceed to trial in Jefferson Circuit Court. The Court will issue a separate order consistent with this opinion.

Charles R. Simpson III, Judge
United States District Court